679 F.2d 907
 220 U.S.App.D.C. 89
 NATIONAL FEDERATION OF FEDERAL EMPLOYEES
v.
Donald J. DEVINE, Director, Office of Personnel Management,
et al., Appellants,
Group Health Association of America, Intervenor.
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
v.
Donald J. DEVINE, Director, Office of Personnel Management, Appellant,
Group Health Association of America, Intervenor.
 Nos. 81-2184, 81-2187.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 15, 1981.
Decided Dec. 21, 1981.
 
 Appeal from the United States District Court for the District of Columbia (D.C. Civil Action Nos. 81-2580 and 21-2617).
 Eloise E. Davies, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, Robert E. Kopp and Anthony J. Steinmeyer, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellants. Kenneth M. Raisler and R. Craig Lawrence, Asst. U. S. Attys., Washington, D. C., also entered appearances for appellants.
 Bruce P. Heppen, Washington, D. C., with whom Catherine Waelder, Washington, D. C., was on the brief, for appellee, National Federation of Federal Employees, in No. 81-2184.
 James R. Rosa, Washington, D. C., with whom Kevin M. Grile and Joseph F. Henderson, Washington, D. C., were on the brief, for appellee, American Federation of Government Employees in No. 81-2187.
 R. Kenly Webster, Washington, D. C., with whom Martin D. Krall, James B. Hamlin and Judith A. Sandler, Washington, D. C., were on the brief, for intervenor, Group Health Ass'n of America in Nos. 81-2184 and 81-2187.
 Philip S. Neal, Washington, D. C., was on the brief for amici curiae Blue Cross Ass'n and Blue Shield Ass'n, urging affirmance of the District Court decision in Nos. 81-2184 and 81-2187.
 Robert M. Tobias, John F. Bufe and William F. White, Washington, D. C., were on the brief for amicus curiae, National Treasury Employees Union, urging affirmance in Nos. 81-2184 and 81-2187.
 Stephen M. Sacks, Washington, D. C., was on the brief for amicus curiae, National Post Office Mail Handlers, AFL-CIO, urging affirmance of the decision to grant preliminary injunctions in Nos. 81-2184 and 81-2187.
 Darryl J. Anderson, Washington, D. C., was on the brief for amicus curiae, American Postal Workers Union, AFL-CIO, urging affirmance in Nos. 81-2184 and 81-2187.
 Robert R. Sparks, Jr. and Janis A. Cherry, Washington, D. C., were on the brief for amici curiae, The American Conservative Union and Congressman Mickey Edwards, urging that the decisions should be vacated.
 Joseph Onek, Washington, D. C., entered an appearance for amici curiae, John and Jane Doe in Nos. 81-2184 and 81-2187.
 Before TAMM, MacKINNON and ROBB, Circuit Judges.
 Opinion PER CURIAM.
 
 
 1
 PER CURIAM:*
 
 
 2
 The American Federation of Government Employees (AFGE) and the National Federation of Federal Employees (NFFE), also referred to as the "Plans," separately complain of the action of the Office of Personnel Management (OPM) in ordering a 6.5% reduction in the contribution by the government for payment of premiums for employee health insurance offered by all carriers at a late stage in the negotiations of the contracts for 1982. The district court sustained the Plans' complaints and issued preliminary injunctions restraining OPM from imposing said 6.5% reduction and ordering OPM to "enter into a health benefits plan contract" with AFGE and NFFE "containing the level of benefits (allegedly) agreed upon by the parties (i.e., the plans and OPM) as of 5:00 p. m. Oct. 20, 1981" with informational brochures to issue in due course. (App. 1-4.)
 
 
 3
 In arriving at its decision the district court concluded that OPM did not properly consider providing maximum health benefits to government employees at the lowest possible costs and that this constituted an abuse of discretion. (App. 13.) The court's Memorandum Opinion states there is nothing in the record to indicate that OPM ever considered the impact its benefit reduction order would have on the health benefits available to government employees and that in ordering the reduction in benefits complained of the government only considered the cost savings that would result to the government. The clear implication in this statement is that OPM did not consider factors that might protect the interests of government employees but relied solely on cost to the government. We cannot agree that there is substantial evidence in the record to justify this inference. On the contrary, the whole history of OPM's handling of this matter indicates that it gave extensive consideration to both the benefits that would be available to government employees as well as to the costs that would be incurred by the government. It must also be recognized that OPM necessarily had the opportunity to evaluate the benefits after the plans submitted their modifications following the 6.5 percent order. We conclude that OPM in ordering the October 21, 1981 6.5% reductions acted within its authority and in a reasonable manner in light of the serious projected budget deficit caused by unpredicted increases in costs in the health benefits field and in light of the pressing statutory deadlines requiring it to complete negotiations with the health carriers.
 
 
 4
 A decision requires a review of OPM's reduction orders and the surrounding circumstances and exigencies that necessitated such actions. One of the difficulties here was caused by the fact that the budget allowance for the 1982 contracts was determined by the outgoing administration but bound the incoming administration upon whom fell the ultimate obligation to approve the health benefit contracts. OPM's consideration in 1981 of renewal of health benefit contracts for the next year began well before March 30, 1981 when it sent the initial "call letters"[1] to the health insurers. In the months that followed approximately 120 plans, including AFGE and NFFE, submitted their proposals for 1982 contracts. In that process OPM and the insurers fully considered all contracts, all benefits thereunder, and the rates and costs therefor. Some tentative conclusions were reached at various times as evidenced by OPM's sending of galley proofs of employee informational brochures to the health carriers.
 
 
 5
 After the 120 plans had submitted their premium rate proposals by the July 31, 1981 deadline, OPM during August conducted an analysis of all submitted plans. This study indicated that the $2.2 billion budget figure for fiscal year 1982 submitted to Congress-which contained a ten percent increase for the government's increase over the allocation for the previous fiscal year, to adjust for the effects of inflation-would prove to be $500 million short of the amount required to pay the government's contribution share to the health benefit plans if OPM approved the 1982 plans as submitted.[2] In an effort to pare the projected deficit to the budgeted amount, OPM decided to live within the budget and to seek reductions in the costs of the plans.
 
 
 6
 On August 21, 1981 OPM officials met with health carrier representatives to announce a benefits reduction order. OPM directed nearly all the plans[3] to make three principal changes:
 
 
 7
 (1) Increase the deductible on supplemental benefits to $200 per individual.
 
 
 8
 (2) Reduce the coinsurance rate to 75% on supplemental benefits.
 
 
 9
 (3) Place most non-hospital charges, such as out-patient tests, in the supplemental benefits program.
 
 
 10
 In directing that these changes be made, OPM stated: "We believe these reductions will spread the burden over as many enrollees as possible so that no enrollee will lose a substantial portion of health benefits." (App. 9.)
 
 
 11
 Following the August 21, 1981 meeting, OPM Director Devine sent the health carriers a Preliminary Analysis, dated September 11, 1981, in which he elaborated upon the circumstances that necessitated the August reduction directive. He advised all the carriers that currently the actual costs to the government for fiscal year 1981 were exceeding the amount appropriated by Congress by an estimated $58 million. (App. 311.) Devine also emphasized that OPM was attempting to comply with fiscal 1982 budget limitations while protecting the interests of both government employees and the taxpayers:
 
 
 12
 To protect the Government employee, it is necessary to keep premiums under control and to maintain benefits at an acceptable level. To protect the taxpayer, it is necessary to keep the Government contribution within budget constraints. The only solution is to pare benefits this year, but to do so only to the extent necessary to protect the budget and the financial integrity of the FEHB (Federal Employee Health Benefits) and the separate insurance plans.
 
 
 13
 (App. 311.) Devine reiterated the three major changes OPM had called for but also noted that reductions in "mental, abortion, dental, and other areas" had also been considered. (App. 315.)
 
 
 14
 Thereafter OPM advised the health carriers that "equivalency proposals" in place of the three reductions specified, supra, could be submitted and that actuarial evaluations of the cost of each plan to the carrier and to the government must be filed by September 25, 1981. (App. 78.) After AFGE and NFFE along with the other plans had timely complied with the September 25, 1981 deadline, OPM subjected their revised proposals to detailed analysis and actuarial evaluation. This extensive study was completed in the middle of October and indicated that the cost to the government of the program, as then submitted by the plans, would still exceed by a substantial margin the appropriation projected in the budget.
 
 
 15
 Acting upon this new information, it was OPM's considered judgment that further health benefit reductions had to be ordered. On October 21, 1981, OPM advised all health carriers that additional benefit reductions of 6.5% would be necessary in order to bring the 1982 contract proposals within available appropriations. (App. 319).[4] Although the health carriers were allowed considerable leeway in determining how to accomplish the 6.5% reduction, they were not given unbridled discretion. OPM indicated that it would continue to monitor the effect of cuts on employee benefits by specifically indicating that "only limited reductions in mental health care benefits" would be acceptable and that unless required by courts to do so, it did not wish to accept coverage for abortions except where the mother's life would be endangered...." Id. At oral argument the court was advised that OPM estimated the 6.5% reduction was necessary to reduce the cost of the government's contribution to the plans by an additional estimated $220 million.
 
 
 16
 The plans were given 48 hours-until 4:00 p. m. on October 23, 1981-within which to comply with OPM's reduction order. All of the 120 health carriers except for AFGE complied with the 48 hour deadline-although some submitted amended plans under protest. NFFE contended that the only way it could comply with the deadline was to make an across the board cut in benefits, even though it maintained that it "would have been able to offer a much better program, taking account of the need for cutbacks, had OPM informed them of the need for benefit cutbacks at the outset of the FEHB negotiation process in March, 1981." (App. 10-11.)[5] AFGE contended that it was unable on such short notice to make the ordered cuts and refused to do so. OPM then made a 6.5% reduction in the AFGE plan and returned it to AFGE as a "counter offer."
 
 
 17
 Both NFFE and AFGE brought suit seeking injunctive relief which was granted on October 30, 1981 by the district court's issuance of a preliminary injunction.[6] The court at that time further ordered OPM to enter into new health benefits plan contracts containing the level of benefits allegedly agreed upon by the parties as of 5:00 p. m. on August 20, 1981, with informational brochures to issue in due course. On November 4, 1981, the district court, for reasons set forth in the margin,[7] amended the August 20, 1981 date by substituting October 20, 1981. The effect of this amendment in the date was to approve the reductions in the plans submitted pursuant to the OPM directive of August 21, 1981. OPM then appealed and this court granted motions for consolidation of the two cases and for an expedited appeal. On December 4, 1981, this court entered a stay of the district court's injunction and order of October 30, 1981 (as modified November 4, 1981).
 
 
 18
 In considering the issues on appeal, we note first that OPM has been granted by statute broad discretionary authority to negotiate and contract for the benefits to be offered by health carriers. The Federal Employees Health Benefits Act of 1959, 5 U.S.C. §§ 8901-8913 (1976 & Supps. III 1979, IV 1980) (as amended), does not require (aside from two exceptions not applicable here) that carriers provide specific benefits,[8] but does vest OPM with considerable latitude in approving benefits. The Act merely requires that the benefits approved by OPM be detailed in the terms of the contract: "Each contract under this chapter shall contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as the Office considers necessary or desirable." 5 U.S.C. § 8902(d) (Supp. IV, 1980) (emphasis added). The discretion conferred on OPM by that grant of authority is very broad. Section 8902(i) also requires that the rates charged by health carriers reasonably and equitably reflect the cost of the benefits provided.
 
 
 19
 Part of OPM's broad discretionary authority to approve health plan benefits is the power to order reductions in benefits. The effect of OPM's October 21, 1981 reduction order was to set a limitation on the level of benefits plans could offer. We also note that the district court never even intimated that it questioned OPM's general authority to order benefit reductions. And it implicitly held that OPM possessed this authority when it approved the initial reductions made by the Plans following the order of August 21, 1981.
 
 
 20
 Of course in determining what benefits are necessary or desirable, OPM must act in a manner consistent with the underlying purposes of the Act. One of those purposes as expressed in the legislative history is to assure maximum health benefits for employees at the lowest possible cost to themselves and to the Government. H.R.Rep.No.957, 86th Cong., 1st Sess. 4 (1959) (emphasis added). When the cost to the government reaches a final figure, the extent and nature of the health benefits to be made available is the only open ended matter. The entire legislative scheme is based upon OPM considering cost to the government in contracting for health benefit plans. For example, the Act requires that "Government contributions for health benefits for an employee shall be paid-(1) in the case of employees generally, from the appropriation or fund which is used to pay the employee...." 5 U.S.C. § 8906(f)(1) (1976). Other subsections dealing with other employees and officials contain a similar limitation. 5 U.S.C. § 8906(f)(2)-(4), (g) (1976).
 
 
 21
 Congress thus indicated that OPM should be restricted in the health benefit plans it may contract for by the available sums appropriated therefor. In this connection the district court expressly found in these cases that "OPM may consider cost to the Government in evaluating the desirable and necessary level of benefits to be offered in health benefit plans." (App. 12.) We agree.
 
 
 22
 Finally, this court recently affirmed by order on the basis of the Memorandum Order of the district court the decision in American Federation of Government Employees, AFL-CIO v. Campbell, Civ. Action No. 80-2751 (D.D.C. Nov. 26, 1980), aff'd sub nom. American Federation of Government Employees, AFL-CIO v. Devine, 672 F.2d 892 (D.C.Cir.1981). In holding that OPM properly limited health carriers to a 50 cent increase in premiums per pay period for new benefits, the district court in the Campbell case stated that "Congress intended that cost to the government be considered when OPM determined what benefits are to be offered." (App. 368.) Section 8906(f)(1), cited supra, makes this plain. The law is thus clear that OPM may and should consider cost to the government in determining what health benefits are necessary or desirable. Other purposes underlie the Act but they are not of immediate importance here.[9]
 
 
 23
 Because OPM has an obligation to consider cost to the government in approving health benefit plans, it acted in a fiscally responsible manner by deciding it must adhere to the President's budgetary guideline which was subsequently approved by Congress.[10] Appellee Plans and the intervenor vigorously argue that OPM is not statutorily required to abide by the budgeted amount. We decline to delve into the statutory intricacies of that point because it will serve no useful purpose. Regardless of whether OPM is statutorily required to adhere to the budget figure approved by the President and Congress, or voluntarily elects to do so, it remains clear that OPM has acted within its discretionary authority in considering itself bound to the $2.2 billion budget figure. We accept the OPM's interpretation of its authority under the applicable statutes.[11] The siren song that budget limitations can be intentionally violated harkens back to a time when the primary desire was to keep taxes low; much more is involved now that the nation is plagued by rampant inflation that silently steals money from our citizens, and now that our economy is harvesting the results of such loose money programs with production and employment reduced to dangerous levels.
 
 
 24
 We, like the district court, have concluded that OPM possessed the authority to order benefit reductions and properly considered cost to the government in ordering the October 21, 1981 reductions. In concluding that OPM nonetheless abused its discretion in making and implementing the October 21 order, the district court asserted that OPM had not considered the impact of the benefit cuts on government employees. It is on this point that we must disagree with the district court.[12] The district court's judgment was based on the conclusion that the order of October 21st was completely separate from the extensive negotiations that preceded it. In actuality, it was merely the last act in a long series of considerations, negotiations and orders that began even prior to the March 30, 1981 call and continued throughout the ensuing negotiations which covered the whole range of benefits and costs.
 
 
 25
 It is axiomatic that a government agency authorized to administer public funds in behalf of a designated group-here federal employees enrolled in health benefit plans-has the implicit duty to perform that function in the best interests of the designated group. In addition, the legislative history of this Act expressly charges the Civil Service Commission (now OPM) with that duty: "Responsibility and authority for the administration of the health benefits program in the interest of both the employees and the government is vested in (OPM)." H.R.Rep.No.957, 86th Cong., 1st Sess. 4 (1959) (emphasis added).[13]
 
 
 26
 The record as a whole simply does not support the assertion that OPM failed to consider the interests of federal employees in ordering the October 21 reductions. The first reductions ordered by OPM on August 21, 1981 gave concrete directions about what types of cuts to make, allowed equivalency proposals to be presented, and permitted sufficient time for health carriers to make sound decisions. The district court upon reexamination of the record concluded as much.[14] The October 21 reduction order was a continuation of the entire budget containment effort begun by OPM back in March of 1981. The October 21 order attempted to effect necessary cost savings within quickly approaching time constraints in a manner least intrusive to government employees' interests. OPM's specific efforts at the time to safeguard employees' interests are evidenced in the fact that it directed health carriers not to make any substantial cuts in the area of mental health benefits. Furthermore, OPM permitted the plans considerable flexibility to exercise their own judgment to make the 6.5% reductions in a manner that would make their plans most competitive. Implicit in that approach is the recognition that the most competitive plans will tend to be those which the subscribers perceive as working in their best interests. Consideration and acceptance by OPM would be the final act.
 
 
 27
 The most persuasive argument offered by the Plans is that they did not receive sufficient time to carefully deliberate and refine their proposals so as to enable them to offer the most competitive plans they were capable of presenting. OPM on the other hand was faced with a November 2, 1981 contracting deadline. It undoubtedly assumed that in view of the long period of negotiation between the parties, the health carriers had accumulated full actuarial data on the cost of the various benefits and could make reasoned judgments within the 48 hour period. With NFFE and AFGE they may have been in error, but approximately 118 carriers presented what they considered to be conforming plans. Despite OPM's efforts to responsibly administer the health benefits program in a manner that would protect and promote the interests of federal government employees while simultaneously fulfilling its equally important obligation to the government of keeping the operation of the program on a sound fiscal basis within the approved budget figure, it appears that the pressing time constraints within which OPM had to act may have resulted in some health carriers not having sufficient time to make sound decisions about the least intrusive manner in which to absorb the ordered 6.5% reductions. Hence, in our opinion all that is necessary at this point is to allow a further brief period of time for those who could not or did not modify their plans, or who now desire to file modified conforming plans, to submit plans conforming to the 6.5% reduction.
 
 
 28
 In Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 869 (D.C.Cir.1970) this court remarked:
 
 
 29
 It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties.
 
 
 30
 424 F.2d at 869. So even conceding for the purpose of argument that some of the parties were not able to modify their plans within the time allowed by OPM, the parties have since had sufficient time to do so, and in our opinion OPM was within its authorized discretion in ordering that the program be brought within the 1982 budget limitation.
 
 
 31
 We therefore reverse the judgment of the district court, vacate its order and direct that it order those plans that desire to submit new or modified plans to the agency to do so on or before seven days from the date this decision is filed. The total cost of said plans must approximate the costs to the government as directed in the fiscal year 1982 budget. Thereafter OPM may consider and finally approve plans that conform to the statute, regulations and budget, and then set a reasonable time at the earliest practicable date for the plans to prepare their informational brochures and to make their plans available. The time constraints in the statute are directory, and not mandatory, since the courts have prevented OPM from complying therewith. The Clerk of Court is directed to issue the mandate immediately.
 
 
 32
 So ordered.
 
 
 
 *
 This opinion originally issued as a judgment, but a subsequent panel has relied upon it and requested that it be published. See Government Employees Hosp. Ass'n v. Devine, 679 F.2d 261, (D.C.Cir.1981)
 
 
 [1]
 The call letter reminded health carriers of their regulatory obligations for contract renewal. Notification was given that the deadline for submission of benefit proposals was April 30, 1981 and the deadline for submission of premium rate proposals was July 31, 1981. The letter stated that negotiations for new benefits would be conducted during May and June with all negotiations to be completed by June 30, 1981
 OPM also stated that its "objective for 1982 (was) to hold premiums and costs as low as possible." It expressed its willingness to consider any benefit proposals but indicated that it was
 likely to accept only (1) those for perfecting changes that are intended to remedy inequitable situations, and result in no, or only minimal, additional premium charges, and (2) those that hold premium charges down through "trade-offs"-reduction in, or elimination of, current benefits of equivalent cost and value-in exchange for new or improved benefits for which there has been a demonstrated need.
 (App. 49.) OPM demonstrated its concern for providing the best possible coverage to government employees at low cost with its following remarks about specific benefits:
 There are two benefits that OPM is interested in for 1982. The first area is for hospice care. We realize that much of the care rendered terminally ill patients is convalescent care and maintenance care not normally covered under our present contract with you. We would like to review any proposals for care of the terminally ill in hospices, including cost estimates. A modified or limited benefit would serve as the best vehicle for exploring this area.
 Secondly, we want to remind all carriers that we are interested in benefits for dental care. However, any proposals for new dental benefits, or for improvement of existing dental provisions, are subject to the limitations on benefit negotiations set forth above. In addition, we will not accept offsetting reductions in other benefits in order to get dental packages, if such reductions sacrifice the overall ability of your plan to provide a good comprehensive benefit package.
 
 
 [2]
 This $500 million estimate was subsequently more precisely calculated to be $440 million
 
 
 [3]
 OPM's August 21, 1981 directive did not apply to health maintenance organizations
 
 
 [4]
 OPM's letter to the health carriers stated:
 Over the past two months, we have shared with you the severe difficulties the Federal Employees Health Benefits Program is encountering in arriving at acceptable benefit and rate packages for 1982. Director Devine's preliminary analysis dated September 11, 1981, which I sent to you on September 18th, detailed many of the problems and reiterated that significant benefit reductions were necessary. It also now appears extremely unlikely that any immediate legislative solution will be forthcoming, as evidenced by discussion at the special joint Senate-House hearing on FEHB held October 19, 1981. Consequently, the only recourse is to take administrative action to obtain reductions in benefit levels if OPM is to stay within the budget levels set by law.
 Since the deadline for contract renewal notice is approaching, immediate action is required both on the part of OPM and plans who wish to continue to participate in the program. The following instructions apply. We are asking each plan to reduce 1982 benefits and rates by at least 6.5 percent. The base from which you should calculate your 6.5 percent reduction is the acceptable equivalency benefit level for 1982 which you submitted in response to our August 21st request. OPM will accept only limited reductions in mental health care benefits and does not wish to accept coverage for abortions except where the life of the mother would be endangered if the fetus were carried to term. However, we are aware that the District Court may direct us not to eliminate or modify coverage for therapeutic abortions without your agreement, unless OPM is prohibited by statute from funding therapeutic abortion coverage under the 1982 benefit plans.
 Accordingly, your written offer of a 6.5 percent reduction in 1982 benefits, including actuarial supporting data, must be received by OPM by no later than 4:00 p. m., October 23, 1981. The failure of any plan to submit an acceptable offer on or before the deadline will be construed as an election by that plan not to participate in the FEHB Program in 1982 and termination notices will be issued forthwith.
 
 
 [5]
 Appellee NFFE submitted its proposed cuts within the original 48 hour deadline. Upon reevaluation NFFE decided that it wanted to modify its October 23, 1981 offer. NFFE sought and received OPM's approval to submit a revised offer on October 26, 1981, which modified offer OPM accepted
 
 
 [6]
 NFFE and AFGE also presented contract claims that the district court found to be without merit. (App. 11 n.3.)
 
 
 [7]
 The Memorandum Opinion of the District Court filed November 4, 1981 states in footnote 1:
 
 
 [1]
 With this Memorandum Opinion, the Court sua sponte modifies the scope of the injunction granted. A reexamination of the record before the Court requires a determination that the August 21 benefit reduction order and its implementation, while hastily conceived and arguably ill-considered, were not an abuse of discretion. Consistent with the statutory mandate, that Order and its implementation permitted a period of negotiation for equivalency reductions to ensure that "no individual and no plan will suffer disproportionately," discussed infra
 
 
 [8]
 5 U.S.C. § 8904 (1976)
 
 
 [9]
 A recent case involving the provision of abortion coverage by health plans, stated two of the Act's other important purposes:
 It is clear from a reading of the statute as a whole and its legislative history that Congress' purposes in enacting the FEHB were to protect federal employees against the high and unpredictable costs of medical care and to assure that federal employee health benefits are equivalent to those available in the private sector so that the federal government can compete in the recruitment and retention of competent personnel.
 American Federation of Government Employees, AFL-CIO v. Devine, 525 F.Supp. 250 at 252 (D.D.C.1981). See S.Rep.No.468, 86th Cong., 1st Sess. 1-2 (1959); H.R.Rep.No.957, 86th Cong., 1st Sess. 1-2 (1959).
 
 
 [10]
 Pub.L.No.97-51, 95 Stat. 958, et seq. (1981). This Joint Resolution making continuing appropriations for the fiscal year approved the $792 million figure as listed in the 1982 budget for annuitants (App. 358.), id. at 95 Stat. 959. In so doing, Congress implicitly adopted the figure for employees and officials as they all must be treated uniformly in the plans
 
 
 [11]
 OPM considers itself bound by the Antideficiency Act which is designed to keep governmental agencies operating within the limits of their appropriated funds. The statute provides as follows:
 No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any purpose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law.
 31 U.S.C. § 665(a) (1976). Appellees contend that OPM is not bound by this provision of the Antideficiency Act because section 8909(a)(1) of the Federal Employees Health Benefits Act authorizes OPM to make the Employees Health Benefits Fund available "without fiscal year limitation for all payments to approved health benefit plans." 5 U.S.C. § 8909(a)(1) (Supp. IV 1980) (emphasis added). However, this is applicable to "approved health benefit plans" and we are dealing with health benefit plans that have not been approved. The quoted provision seems to contemplate approved contracts that provide for government payments that straddle fiscal years.
 
 
 [12]
 The district court's conclusion that OPM did not consider the effect further cuts in benefits would have on the overall level of benefits available to government employees appears to be in large measure anchored upon the court's finding that the Government's attorney conceded at the October 30 hearing that "cost-cutting was the only concern in ordering the 6.5% reductions." (App. 13.) Our reading of the trial court transcript on this point is that counsel for OPM, in dialogue with the trial court concerning the scope of OPM's discretion to order reductions, or set limitations, did not state that OPM had made decisions about approving benefits solely on the basis of cost to the government but merely stated that it could do so. We do not interpret the remarks of OPM's counsel as "conceding" that OPM only considered cost to the government in making the October 21 reduction order. Regardless of our disagreement with the district court on this matter, we are of the opinion that substantial evidence in the record as a whole shows that OPM did consider the interests of government employees in its on-going effort to keep the cost to the government within the budget limitation of $2.2 billion. In addition to their interest in specific benefits, government employees, along with citizens generally, have a personal interest in the government pursuing sound fiscal policies
 
 
 [13]
 To the same effect is this excerpt from the legislative history: "For the premiums agreed upon, the Commission is charged with negotiating the best possible basic health and major medical benefits. These provisions are designed to assure maximum health benefits for employees at the lowest possible cost to themselves and to the Government." H.R.Rep.No.957, 86th Cong., 1st Sess. 4 (1959)
 
 
 [14]
 See n.7, supra