

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-26-1995

# Health Mainten. Org. of New Jersey, Inc. v. Whitman

Precedential or Non-Precedential:

Docket 94-5698

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Health Mainten. Org. of New Jersey, Inc. v. Whitman" (1995). *1995 Decisions.* Paper 318.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/318

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
——————————

No. 94-5698
——————————

THE HEALTH MAINTENANCE ORGANIZATION OF NEW
JERSEY, INC., d/b/a HMO/NJ

Appellant,

vs.

CHRISTINE TODD WHITMAN, in her capacity as
Governor of the State of New Jersey;
ELIZABETH RANDALL, in her capacity as
Commissioner of the Department of Insurance
of the State of New Jersey; CHARLES
WOWKANECH, in his capacity as Chairman of the
Individual Health Coverage Program

Appellees.

——————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 93-cv-05775)
——————————

ARGUED OCTOBER 11, 1995
BEFORE:  GREENBERG, LEWIS and ROSENN, Circuit Judges.

(Filed December 26, 1995)
——————————


Alan J. Davis (ARGUED)
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, PA  19103

        Attorney for Appellant

Michael E. Goldman (ARGUED)
Office of Attorney General of New Jersey
Department of Law & Public Safety
Richard J. Hughes Justice Complex
Trenton, NJ  08625

          Attorney for Appellees


Frank W. Hunger
 Assistant Attorney General
Faith S. Hochberg
 United States Attorney
Anthony J. Steinmeyer
Jeffrey Clair
United States Department of Justice
Appellate Civil Division, Room 3617
Washington, DC  20530-0001

          Attorneys for United States as Amicus Curiae

B. John Pendleton, Jr.
McCarter & English
100 Mulberry street
Four Gateway Center
Newark, NJ  07101-0652

          Attorney for Blue Cross and Blue Shield
          New Jersey as Amicus Curiae

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

        This appeal requires us to address the delicate balance
between federal and state authority established under the
Supremacy Clause of the United States Constitution.  The Health
Maintenance Organization of New Jersey ("HMO/NJ") appeals from
the district court's grant of summary judgment to defendants

Christine Todd Whitman, the Governor of New Jersey, Elizabeth Randall, the Commissioner of the New Jersey Department of Insurance, and Charles Wowkanech, the Chairman of the New Jersey Individual Health Coverage Program (collectively, "the State"). The sole issue we address in this appeal is whether the Federal Employee Health Benefits Act, 5 U.S.C. §§ 8901, et. seq. ("FEHBA") preempts certain provisions of the New Jersey Health Insurance Reform Act, N.J.S.A. §§ 17B:27A-2 – 27A-16.4 (the "Reform Act"). HMO/NJ argues that the premium assessments under the Reform Act are preempted by FEHBA because they will increase the cost of individual health care benefits to federal employees, benefits which are payable from the Federal Employee Health Benefits Fund. We agree. For the reasons set forth below, we hold that section 8909(f) of FEHBA preempts premium assessments under the Reform Act when applied to insurance plans governed by FEHBA, and will reverse the district court's order on the issue of FEHBA preemption.

I.

A.

In response to this nation's growing health care crisis, New Jersey enacted the Reform Act to ensure that all its citizens would receive the benefits of individual health care coverage. (Individual health care coverage is coverage offered by an insurance company or health maintenance organization directly to an individual and his or her family. By increasing the availability of individual health care coverage, the State intends to reduce the number of uninsured self-employed or

3

unemployed residents, who often do not have the option of purchasing employer-based or group health coverage).

Under the Reform Act, a non-compensated, nine-member Board of Directors "shall establish the policy and contract forms and benefit levels to be made available" under an Individual Health Coverage Program.  N.J. Stat. Ann. § 17B:27A-7.  In 1993, the Board of Directors devised a program whereby state residents would be offered five standardized individual health plans.[1]  The program requires New Jersey health insurance companies and health maintenance organizations (collectively referred to in the Reform Act as "carriers") to offer state residents the five standardized policies as a condition of continuing to issue any type of health benefit plans in the state.  See N.J. Stat. Ann. §§ 17B:27A-4, 17B:27A-(a)(3)(c).  Carriers were required to start offering the five plans on August 1, 1993.

The central component of the Reform Act is the requirement that all carriers in the state pay an "assessment"

---

[1]  The five standardized plans are intended to offer residents a range of coverage with varying co-payment levels and a choice of deductibles.  These plans are guaranteed, which ensures that an eligible applicant (in general, one is eligible for a standardized plan if unable to procure group coverage, Medicare, or Medicaid) will not be denied coverage.  See N.J. Stat. Ann. §17B:27A-6(a).  The plans are also "community rated," so that a carrier must offer a standard plan to everyone at the same rate regardless of the applicant's age, gender, profession, health status, or place of residency within the state.  See id.  If an uninsured resident applies for one of the standard plans, and that applicant has a pre-existing health condition, the carrier is allowed to deny coverage for the preexisting condition for one year, but thereafter must cover all conditions.  N.J. Stat. Ann. § 17B:27A-7(b).  With the goal of making the individual policy market a competitive one, the State does not regulate the rates charged by carriers for the five plans.

4

that is used to defray financial losses incurred by those companies that provide a disproportionate share of the "higher-risk" individual health insurance coverage in the state. In group health plans, the cost of insuring higher-risk people, individuals who require expensive medical treatment, is spread among the entire insured population. In contrast, when people are individually insured, these costs must be borne by either the individual or the insurance company. As a result, insurance sold on an individual basis may be prohibitively expensive for the consumer and unprofitable for the insurance company. Through the assessment, the Reform Act attempts to spread the cost of insuring higher-risk individuals among New Jersey's entire insurance industry in order to reduce the cost to the individual while increasing the profitability of insuring those individuals.

New Jersey carriers are required to "pay or play" with respect to the individual health insurance market. For each carrier, the Board establishes a target goal of individual policies, or more specifically "non-group" policies, that the carrier must issue in a calendar year if it wishes to obtain an exemption from the assessment. In general, a carrier's target number of non-group policies for the exemption is calculated based on the carrier's proportion of the overall state-wide health coverage market. See N.J. Stat. Ann. § 17B:27A-12(d)(3).

The State pools the money collected pursuant to the annual assessment and uses it to reimburse carriers who suffer losses in the individual insurance market during the calendar year. The assessment is calculated as the proportion of the

5

carrier's "net earned premium" for the calendar year preceding the assessment in relation to the net earned premium of all carriers for the calendar year preceding the assessment. N.J. Stat. Ann. § 17B:27A-12(a)(2). The Reform Act uses a carrier's net earned premium as a proxy for the carrier's market share. A simplified example would be if a carrier earned 15% of all health insurance premiums in New Jersey, then it would be assessed 15% of the total losses incurred by carriers issuing individual policies. The "net earned premium" is all premiums earned in New Jersey by a carrier on any of its health benefit plans, including "the aggregate premiums earned on the carrier's insured group and individual business and health maintenance organization business[.]" N.J. Stat. Ann. § 17B:27A-2. Notably, premiums from self-insured plans administered by a carrier are not included in the assessment calculation. In addition, carriers are assessed their proportion of the administrative expenses incurred by the Individual Health Coverage Program. § 17B:17A-11(a).

### B.

FEHBA provides health benefits for federal employees, their families, and federal retirees. See 5 U.S.C. § 8901 et seq. The program is administered by the Office of Personnel Management ("OPM"), which is authorized to negotiate contracts with qualified carriers for the provision of health benefits to federal employees and other enrollees. Premiums for enrollment in a health plan are set annually and determined in OPM's contract negotiations with each participating carrier.

6

The costs of enrolling in a health plan are paid by contributions from the enrollee and the federal government. The government's share is equal to 60% of the average premium charged by major participating health plans and may not exceed 75% of the total charge for enrollment. 5 U.S.C. § 8906. The balance of the enrollment charge is paid by the enrollee and withheld from the enrollee's salary or retirement annuity. These contributions are then paid into a specifically-designated account in the United States Treasury: the Employee Health Benefits Fund (the "Fund"). 5 U.S.C. § 8909. Payments and reimbursements to participating insurance carriers are then made from the Fund.

As part of the Omnibus Budget Reconciliation Act of 1990, Pub.L. 101-508, Congress amended FEHBA by adding subsection 8909(f) which provides that:

(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a carrier or an underwriting or plan administration subcontractor of an approved [FEHBA] health benefits plan by any State * * * or by any political subdivision or other governmental authority thereof with respect to any payment made from the Fund.

(2) Paragraph (1) shall not be construed to exempt any carrier underwriting or plan administration subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such carrier or underwriting or plan

7

> administration subcontractor from business
> conducted under [FEHBA], if that tax, fee, or
> payment is applicable to a broad range of
> business activity.

5 U.S.C. 8909(f).

C.

HMO/NJ, a wholly owned subsidiary of U.S. Healthcare, Inc., is a health maintenance organization licensed by New Jersey to provide health care benefit plans to employers and individuals in the state. Specifically, HMO/NJ also has a contract with the federal government to provide health care benefits to federal employees and federal enrollees who select HMO/NJ as their provider. For the 1992 calendar year, HMO/NJ was assessed $429,783 under the Reform Act's premium assessment program. The total 1992 assessment for all program members was $2,613,005. HMO/NJ paid its assessment, and it did not receive a 1992 reimbursement under the assessment program. In 1993, HMO/NJ paid an assessment of $6.4 million, again without receiving a reimbursement under the program. Like other carriers, HMO/NJ began to issue the five standardized plans on August 1, 1993. In 1993 to qualify for an exemption from the assessment HMO/NJ's target number of non-group policies was 10,000; as of December 27, 1993, HMO/NJ had issued only 428 non-group member policies. In contrast, to compensate for losses on its individual policies during that year, Blue Cross & Blue Shield of New Jersey received a 1993 program reimbursement of approximately $54 million.

8

The Reform Act's assessment provision is at the heart of HMO/NJ's preemption claim. HMO/NJ claims that "as a result of having to pay into the premium assessment program, without receiving any of the proceeds therefrom, HMO/NJ has been forced to include a provision in its rates to subscribers -- principally private sector employee benefit plans and <u>federal employee plans</u> -- to cover the cost of the premium assessment." <u>See</u> Appellant's Brief p.12 (emphasis added). A direct result of the 1993 assessment has been that HMO/NJ increased the cost of health care benefits to its subscribers by "about one percent." As a result, HMO/NJ argues that "[t]he assessment is . . . a state imposed tax, fee or monetary payment on FEHBA plans. Accordingly, it falls within the realm of FEHBA preemption." <u>Id.</u>, p.16.

HMO/NJ filed a lawsuit in the federal district court for the District of New Jersey asserting that the State's premium assessment program is preempted by both the Employee Retirement Income Security Act ("ERISA") and by 5 U.S.C. § 8909(f) of FEHBA. Ruling on cross-motions for summary judgment, the district court held that neither federal statute preempted the relevant provisions of the Reform Act. (For the purposes of this appeal our review is limited to the issue of FEHBA preemption). The court concluded that FEHBA did not preempt the State scheme because the statute itself allows states to impose assessments "applicable to a broad range of business activity," 5 U.S.C. § 8909(f)(2), and the New Jersey statute fell within this savings provision because the state law "does not specifically target FEHBA plans." <u>The Health Maintenance Organization of New Jersey</u>

9

v. Christine Todd Whitman, No. 93-5775, slip op. at 8 (D. N.J. Oct. 3, 1994).  This appeal followed.

## II.

The district court had jurisdiction over this matter under 28 U.S.C. § 1331.[2]  We have jurisdiction under 28 U.S.C. § 1291.[3]  Our review of the district court's grant of summary judgment is plenary, Public Interest Research of N.J. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 71 (3d Cir. 1990); Wheeler v. Towanda Area School Dist., 950 F.2d 128, 129 (3d Cir. 1991), as is our review of all questions of law.  Epstein Family Partnership v. Kmart Corp., 13 F.3d 762, 765-66 (3d Cir. 1994).

## III.

Under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, federal law preempts state law "either by express provision, by implication, or by a conflict between federal and state law." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 115 S. Ct. 1671, 1676 (1995).  In other words, "[w]here a state statute conflicts with or frustrates federal law, the former must give way." CSX Transportation v. Easterwood, 123 L.Ed.2d 387, 396 (1993).  In order to avoid an unintended encroachment on state authority, the Supreme Court has made clear that when interpreting a federal statute, courts

---

[2]  "The district court shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

[3]  "The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."  28 U.S.C. § 1291.

10

should be reluctant to find preemption. Id. at 396; Travelers, 115 S. Ct. at 1676. Instead, we begin with the presumption that Congress does not intend to preempt state law. Travelers, 115 S. Ct. at 1676. State law will only be preempted when it is the "clear and manifest purpose of Congress." CSX, 123 L.Ed.2d at 396 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); Travelers, 115 S. Ct. at 1676; Cipollone v. Liggett Group, Inc., 112 S. Ct. 2608, 2617-18 (1992); Metropolitan Life Ins. Co. v. Massachusetts, 472 U.S. 724, 740 (1985).

To determine Congress' intent, we begin with the text of the statute in question, and then move on to "the structure and purpose of the Act in which it occurs." Travelers, 115 S. Ct. at 1677. As the Supreme Court has stated:

> If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.

CSX, 123 L.Ed.2d at 396. If Congressional intent is unclear, however, courts should defer to an implementing agency's interpretation of the statute, as long as that interpretation is reasonable. See Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). With these principles in mind, we conclude that Congress intended to preempt state law in this instance.

11

A.

The plain language of subsection 8909(f)(1) of FEHBA preempts the New Jersey Reform Act's premium assessment. In interpreting any statute, we begin with the plain language of the statute itself. Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990); In re Segal, 57 F.3d 342, 345 (3d Cir. 1995) ("[W]e begin with the familiar canon that the starting point for interpreting a statute is its plain language.") (citing Mansell v. Mansell, 490 U.S. 581, 588 (1989)); Resolution Trust Corp. v. Cityfed Financial Corp., 57 F.3d 1231, 1237 (3d Cir. 1995). While the expression "plain language" may in certain instances be an oxymoron, In re Segal, 57 F.3d at 346, unless there is a clear expression of legislative intent to the contrary, Kaiser, 494 U.S. at 835, "courts must presume that a legislature says in a statute what it means and means in a statute what it says." Connecticut Nat'l Bank v. Germain, 112 S. Ct. 1146, 1149 (1992).

Title 5 of the United States Code, at section 8909(f)(1) provides that:

> (1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a carrier or an underwriting or plan administration subcontractor of an approved [FEHBA] health benefits plan by any State * * * or by any political subdivision or other governmental authority thereof with respect to any payment made from the Fund.

12

5 U.S.C. 8909(f).  Under section 8909(f)(1), state regulation is preempted if it is (1) a state or local tax, fee, or other monetary payment; (2) imposed directly or indirectly on a carrier; and (3) with respect to payments made from the Employee Health Benefits Fund.  See Travelers Ins. Co. v. Cuomo, 14 F.3d 708, 715 (2d Cir. 1993) (holding that a state surcharge on hospital rates was preempted by both ERISA and FEHBA), reversed on other grounds, New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 115 S. Ct. 1671 (1995) (holding that ERISA did not preempt the state surcharge).  Although there is no dispute that the premium assessment satisfies the second criteria, the state argues that the assessment does not meet the first and third criteria.

The State argues that the Reform Act's premium assessment is not preempted by section 8909(f)(1) for two reasons.  First, the State argues that Congress only intended FEHBA preemption to apply to "premium taxes," and that the premium assessment cannot be considered a premium tax because it is "apportioned on the basis of market share, not premiums." (Appellees' Br. at 42) (emphasis in original).  (Premium taxes are defined as those taxes "imposed on FEHB premiums by any State . . ."  48 C.F.R. § 1652.216-71 (1992)).  The State's argument is based on language in the statute's legislative history[4] as well

_____

[4]  H.R. No. 101-881, 101st Cong., 2d Sess. 173 reprinted in 1990 U.S.C.C.A.N. at 2181 ("exempts the FEHB from state premium taxes"); H.R. No. 101-881, 101st Cong., 2d Sess. 176 reprinted in 1990 U.S.C.C.A.N. at 2184 ("This state premium tax exemption is intended to be similar in nature and application to the existing premium tax exemptions applicable to the Employee's Life

13

as its title in section 7002(c) of OBRA ("EXEMPTION FROM STATE PREMIUM TAXES"). Second, the State argues that even if the assessment falls within section 8909(f)(1)'s definition of "tax, fee, or other monetary payments," it is not made "with respect to any payment from the fund." (Appellees' Br. at 42-43). According to the State, the premium assessment simply represents a general cost of doing business. The fact that this cost is passed on to FEHBA enrollees is a purely voluntary decision made by the carrier. Neither the Reform Act nor its implementing regulations mandate such a result. In presenting these arguments, the State argues that we must reject the Second Circuit's reasoning in Travelers.

We find these arguments unpersuasive. By its terms, section 8909(f)(1) prohibits the imposition of taxes, fees, or other monetary payments. The plain language of the statute is therefore not limited to "premium taxes," and the assessment clearly falls within the definition of a "fee" or "other monetary payment." As a result, the only genuine question is whether the premium assessment program is imposed "with respect to any payment from the Fund." Contrary to the State's position, OPM's interpretation of the statute and the statute's general legislative history support a broad interpretation of the statute's third criterion. Because the Second Circuit addressed

_____

Insurance Fund, as set forth in section 8714 of title 5, United States Code."); H.R. Conf. Rep. No. 101-964, 101st Cong., 2d Sess. 2184, reprinted in 1990 U.S.C.C.A.N. at 2374, 2681 ("the conference agreement includes the House and Senate provisions . . . exempting the FEHBP from State premium taxes").

14

these very same issues and we agree with its reasoning in Travelers, we will discuss the decision in greater detail.

In facts very similar to those before us, the Second Circuit in Travelers concluded that FEHBA preempted several New York hospital surcharges. In its effort to contain health care costs and guarantee the availability of hospital insurance coverage to needy New Yorkers, New York enacted three hospital surcharges. New York Public Health Law § 2807-c(1)(b) required insurance carriers other than Blue Cross & Blue Shield, an HMO, or a government insurance such as Medicaid, to pay a 13% surcharge directly to the hospital. New York Public Health Law § 2807-c(11)(i) (McKinney Supp. 1993) required an additional 11% surcharge charged to patients covered by commercial insurance, and New York Public Health Law § 2807-c(2-a)(a) (McKinney Supp. 1993) required an assessment of up to 9% on HMOs which failed to enroll a target number of Medicaid-eligible persons. The proceeds from the 11% and 9% surcharges were paid into a statewide pool, and subsequently ended up in the State's general fund. Travelers, 14 F.3d at 712. The court found that the primary purpose of the 11% surcharge was to increase the cost of commercial insurance thereby making Blue Cross & Blue Shield more competitive, while the purpose of the 9% surcharge was to "encourage HMOs to enroll Medicaid recipients, thereby lowering the costs of the Medicaid program." Id. Like the New Jersey Reform Act's premium assessment, the overall purpose of these surcharges was to spread the cost of insuring individuals who are unable to obtain individual health care insurance. The Second

15

Circuit found that the New York surcharges were preempted under ERISA and FEHBA. (The Supreme Court granted certiorari only on the issue of ERISA preemption and reversed the Second Circuit in New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 115 S. Ct. 1671 (1995)).

In addressing the issue of FEHBA preemption, the court found that the plain language of section 8909(f)(1) preempted New York's surcharges, and that this conclusion was consistent with OPM's interpretation of the statute as well as the Act's overall purpose of reducing government expenditures. In Travelers, the appellants, like the State in this action, argued that FEHBA preemption was limited to "premium taxes." In rejecting this position, the court stated that "[t]o adopt the defendants' crabbed view of preemption would undermine" the revenue-saving purpose of section 8909(f)(1), FEHBA, and OBRA in general. 14 F.3d at 716. The court then concluded that "[b]ecause payments from the Fund are directly affected by what the hospitals charge for their services, and because the surcharges increase the amounts carriers draw from the Fund, the surcharges are clearly imposed `with respect to . . . payment[s] made from the Fund.'" Id. We agree.

As mentioned earlier, the plain language of section 8909(f)(1) prohibits the imposition of taxes, fees, or other monetary payments. Section 8909(f)(1) clearly states that "[n]o tax, fee, or other monetary payment may be imposed . . ." The language used in the statute makes no reference to "premium taxes," and provides no indication that the statute is limited to

16

that particular form of tax.  Interpreting the plain language of the statute, we conclude that Congress intended to preempt the imposition of any tax, fee, or monetary payment on FEHBA carriers with respect to payments from the Fund.

Even if we were to find that the statute's language is ambiguous, based upon the statute's legislative history and administrative regulations our conclusion would be the same. Although the statute's legislative history does occasionally use the term premium taxes, see supra note 4, the same legislative history describes section 8909(f) as exempting FEHBA from "any tax, fee, or other monetary payment . . . ."  H.R. No. 101-881, p.176, reprinted in 1990 U.S.C.A.A.N. at 2184.  According to OPM, the phrase "premium taxes" represents a shorthand reference to the more cumbersome clause itself.  See Travelers, 14 F.3d at 717.  As a result, OPM interprets the statute as follows:  "[t]he prohibited payments, referred to elsewhere in these regulations as `premium taxes,' applies to all payments directed by States or municipalities, regardless of how they may be titled, to whom they must be paid, or the purpose for which they are collected . . . ."  48 C.F.R. § 1631.205-41 (emphasis added).  Given the statute's plain language, OPM's interpretation of the statute is reasonable and compels us to reject the State's narrow reading of FEHBA's preemption provision.  See Chevron, 467 U.S. at 843.  See also Louisiana Public Service Com. v. FCC, 476 U.S. 355, 368-69 (1986) ("[A] federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."); Fidelity Federal Sav. & Loan Ass'n v. De La

17

*Cuesta*, 458 U.S. 141, 153–54 (1982) (valid federal regulation intended to displace state law has no less preemptive effect than a federal statute); *Freehold Cogeneration Associates v. Board of Regulatory Comm'rs of the State of New Jersey*, 44 F.3d 1178, 1190 (3d Cir. 1995) ("Under the Supremacy Clause of the United States Constitution, a federal agency acting within the scope of its congressionally delegated authority has the power to preempt state regulation and render unenforceable state or local laws which are otherwise not inconsistent with federal law.").[5]

The interpretation of "with respect to any payment made from the Fund" is a slightly harder question. Neither the statute or the legislative history defines this specific criterion. Once again, however, OPM's regulations provide us with guidance. According to OPM, section 8909(f)(1)'s prohibition applies to "all forms of direct and indirect measurements on FEHBP premiums, however modified . . ." 48 C.F.R. § 1631.205–41. The court in *Travelers* understood this to include any direct or indirect tax that resulted in increased payments from the Fund. 14 F.3d at 716. As discussed earlier, FEHBA participants and the federal government contribute payments to the Federal Employees Health Benefits Fund. Carriers like HMO/NJ who have a contract with the federal government to provide health benefits coverage are paid for their services directly from the Fund. 5 U.S.C. § 8909(a)(1) (premium contributions to

---

[5] There is no dispute that OPM is vested with the authority to administer, oversee, and promulgate regulations for the FEHBA program. *See* 5 U.S.C. §§ 8902, 8909(a) and 8913.

18

the Fund are available for all payments to approved health benefits plans); 48 C.F.R. § 1632.170(a) ("OPM will pay to carriers of community-rated plans the premium payments received for the plan . . . . Premium payments will be due and payable no later than 30 days after receipt by the Federal Employees Health Benefits (FEHB) Fund.").[6] Given this payment scheme, the Reform Act's premium assessment is imposed "with respect to any payment made from the fund" because the amount OPM must pay to HMO/NJ is based on HMO/NJ's premiums which have increased in part as a result of the premium assessment. Because payments from the fund are directly affected by what HMO/NJ charges for its services, and the premium assessment increases the amount OPM must pay from the Fund, New Jersey's premium assessment are imposed "with respect to . . . payment[s] made from the Fund." Although this may be characterized as an indirect imposition because the increased payment is based upon HMO/NJ's voluntary decision to pass the costs of the premium assessment along to FEHBA plans, the plain language of FEHBA section 8909(f)(1) unequivocally

---

[6]     HMO/NJ's plans are community rated plans. "Community rate means a rate of payment based on a per member per month capitation rate or its equivalent that applies to a combination of the subscriber groups for a comprehensive medical plan." 48 C.F.R. § 1602.1702(a). The plans addressed in Travelers were experience-rated plans whose contribution rates "are based on the plan's actual paid claims, administrative expenses, and other allowable `retentions.'" 14 F.3d at 715-716 n.2 (citing 48 C.F.R. § 1602.170-6 (1992)). Although both types of plans receive funds directly from the Fund, their methods of payment are differ. Community rated plans have their premiums paid directly from the Fund, 48 C.F.R. § 1632.170(a), while experience rated plans must draw against letter-of-credit accounts on a "checks presented" basis. 48 C.F.R. § 1632.170(b).

19

preempts indirect as well as direct taxes, fees, or other monetary payments, 5 U.S.C. § 8909(f)(1) ("No tax, fee, or other monetary payment may be imposed, <u>directly or indirectly</u> . . .") (emphasis added).

Our interpretation of FEHBA section 8909(f)(1) is consistent with the Act's overall purpose.  The general purpose of the FEHBA program is to:

> protect federal employees against the high and unpredictable costs of medical care and to assure that federal employee health benefits are equivalent to those available in the private sector so that the federal government can compete in the recruitment and retention of competent personnel.

<u>National Federation of Federal Employees v. Devine</u>, 679 F.2d 907, 913 n.9 (D.C.Cir. 1982) (quoting <u>AFGE v. Devine</u>, 525 F. Supp. 250, 252 (D. D.C. 1981)).  FEHBA section 8909(f) was enacted in 1990 to achieve budgetary savings without sacrificing the quality of health care protection provided by FEHBA or impairing the government's ability to attract and retain talented personnel. <u>See</u> H.R. No. 101-881, 101st Cong., 2d Sess. 173, 181 (1990), <u>reprinted in</u> 1990 U.S.C.C.A.N. 2181, 2190.  It was passed in response to a U.S. General Accounting Office report indicating that the government could cut costs by exempting FEHBA carriers from state taxes.  <u>See</u> United States General Accounting Office, <u>Federal Compensation:  Premium Taxes Paid by the Health Benefits Program</u>, GAO/GGD 29-102 (August 8, 1989) (Joint Appendix at 530).  According to the legislative history, the savings presumably would "result from reduced program costs which in turn reduce the employer premiums the Government pays."  H.R. No. 101-881, 101st

20

Cong., 2d Sess. 190 (1990), reprinted in 1990 U.S.C.C.A.N. 2198. The New Jersey assessment, which increases the cost of providing health care to the federal government and its employees, frustrates these congressional objectives.  Based upon the plain language of the FEHBA preemption statute, OPM's implementing regulation, and the federal policies and objectives underlying the statute's enactment, we conclude that the New Jersey Reform Act's assessment scheme is preempted by FEHBA section 8909(f)(1). Having reached this conclusion, we now address whether the scheme is nonetheless "saved" by FEHBA section 8909(f)(2).

B.

FEHBA section 8909(f) is best understood as Congress' effort to exempt FEHBA plans from certain generally applicable laws.  We must interpret section 8909(f)(2) in order to determine the scope of that exemption.  FEHBA section 8909(f)(2) provides:

> Paragraph (1) shall not be construed to exempt any carrier underwriting or plan administration subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such carrier or underwriting or plan administration subcontractor from business conducted under [FEHBA], if that tax, fee, or payment is applicable to a broad range of business activity.

5 U.S.C. 8909(f)(2) (emphasis added).  In other words, a tax, fee, or other monetary payment that would otherwise be preempted under subsection 8909(f)(1) is "saved" if it is "applicable to a broad range of business activity."  In upholding the New Jersey scheme, the district court concluded that the premium assessment was applicable to a broad range of business activity.  The court reasoned that "for FEHBA plans to be exempt from state-imposed premium taxes, the state tax must be specifically levied against the FEHBA plan."  The Health Maintenance Organization of New Jersey v. Christine Todd Whitman, No. 93-5775, slip op. at 8 (D. N.J. Oct. 3, 1994).  We disagree.

The plain language of the statute requires a more expansive exemption for FEHBA plans.  According to section 8909(f)(2), states are preempted from imposing any tax, fee, or other monetary payment on carriers of FEHBA plans except those taxes, fees, or other monetary payments that are "applicable to a broad range of business activity."  By definition, "broad range" is synonymous with "wide range" or "extensive" business activities.  See The Random House College Dictionary 171 (Rev. ed. 1982); Webster's New World Dictionary 176 (3d ed 1988) (broad:  "wide in range; not limited").  If Congress had intended only to preempt taxes specifically targeting FEHBA plans, it would have said so expressly.  Instead, the statute's language reflects an intent to exempt FEHBA plans from all taxes and fees except those generally applicable to other commercial industries.

In addition to the plain language of the statute, our interpretation is justified by the statute's underlying purpose.

22

As discussed earlier, FEHBA section 8909(f) was enacted as a cost saving measure. If we were to accept the district court's interpretation of subsection 8909(f)(2), it would render all of section 8909(f) superfluous. The Constitution itself prohibits states from specifically targeting the Federal Government and Federal programs. Under the Supremacy Clause, "state taxes on contractors are constitutionally invalid if they discriminate against the Federal Government, or substantially interfere with its activities." United States v. New Mexico, 455 U.S. 720, 735, n.11 (1982). A statute preempting such action is therefore unnecessary, and if subsection 8909(f)(2) was intended to preempt only state taxes specifically targeting FEHBA plans, FEHBA section 8909(f) as a whole would not save the Federal Government any money because those taxes are already prohibited by the Constitution.

The district court's narrow interpretation would also undermine one of the statute's specific objectives – exempting FEHBA plans from state premium taxes. As the State has consistently argued, FEHBA section 8909(f)(1) was enacted to exempt FEHBA plans from state premium taxes. (As we discussed earlier, section 8909(f) exempts other taxes, fees, and monetary payments as well). Because premium taxes do not specifically target FEHBA plans, under the district court's interpretation, they would be saved from preemption by section 8909(f)(2). This result is clearly inconsistent with one of the statute's principal goals, and must be rejected. The goal of preempting state premium taxes also guides our interpretation of what

23

Congress considered "a broad range of business activity." Because premium taxes are applicable to the entire insurance industry, it would appear that a tax, fee, or other monetary payment is imposed on "a broad range of business activity" when, at the very least, it applies to more than a single industry.  A less inclusive definition, like the one adopted by the district court, would permit states to impose a tax that Congress specifically meant to preempt.  Given Congress' objective, a tax applicable to only a single industry like insurance, banking, or real estate, cannot be treated as applying to a broad range of business activity.  At the very least, the tax must apply to more than a single industry or business activity.

The New Jersey Reform Act's premium assessment scheme is not imposed on "a broad range of business activity."  Unlike a state premium tax, the Reform Act's premium assessment is not even imposed on the insurance industry as a whole.  The assessment "applies <u>only</u> to the health insurance business and, even within that limited field, carves out a list of health insurance activities that are not subject to the statutory levy." (United States as Amicus Curiae, Br. at 16).  The New Jersey statutory scheme excludes certain accident policies, Medicare coverage, and other types of insurance plans that offer health benefits.  <u>See</u> N.J.S.A. § 17B:27-A-2.  As such, the premium assessment is imposed on a rather limited range of business activity, and is not saved by subsection 8909(f)(2). Accordingly, the Reform Act's premium assessment scheme is preempted as applied to FEHBA plans.  We hasten to add, however, that we hold

24

only that FEHBA preempts New Jersey's premium assessment scheme as applied to FEHBA plans. We do not hold that the Reform Act's assessment provisions are preempted or inapplicable to all of the insurance activities of carriers like HMO/NJ.

IV.

Although we hold that FEHBA preempts the New Jersey Reform Act's premium assessment program as applied to FEHBA plans, we are compelled to note that we are somewhat troubled that our ruling today impedes the State's legitimate effort to reform the existing health care system and provide needed health care coverage to all its citizens. We are mindful that Congress' failure to reform the provision of health care at the national level has increased the need for a state by state resolution of this problem. Until Congress amends FEHBA, however, our decision is dictated by the plain language of the statute, its legislative history, and the Act's overall purpose. We cannot grant the states authority which Congress, in a legitimate exercise of its authority, specifically denied. Accordingly, the district court's order with respect to FEHBA preemption will be reversed.

In view of our conclusions, the district court's order with respect to FEHBA preemption will be reversed. We will remand this matter to the district court for further proceedings to fashion a remedy. In this regard we note that in its amicus curiae brief the United States suggests a method to implement a holding that the Reform Act is preempted with respect to FEHBA policies. On the remand the district court should consider this

25

proposal as well as any other suggestions the parties may make to give effect to this opinion.