**RTC MORTGAGE TRUST 1994 N–1, a limited liability Delaware business trust, Plaintiff,**

v.

**FIDELITY NATIONAL TITLE INSURANCE COMPANY, Nations Title Insurance Company, Eastern Developers Abstract, Inc., Caine, DiPasqua, Sloane & Raffaele f/k/a Caine, DiPasqua, Sloane, Raffaele & Nigro, Lawyers Title Insurance Corporation, and Rocco M. Nigro, Defendants.**

Civil Action No. 96–5874.

United States District Court, D. New Jersey.

Aug. 14, 1998.

John A. Adler, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, for Plaintiff RTC Mortg. Trust 1994 N-1.

Michael S. Miller, Christopher J. Carey, Tompkins, McGuire & Wachenfeld, Newark, NJ, for Defendant, Caine, DiPasqua, Sloane & Raffaele.

Charles J. Vinicombe, Drinker, Biddle & Reath, Princeton, NJ, for Defendant, Lawyers Title Ins. Corp.

Josiah A. Knapp, Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano, P.C., Cherry Hill, NJ, for Defendants, Fidelity Nat. Title Ins. Co. and Nations Title Ins. Co.

Rocco Nigro, Media, PA, pro se.

## OPINION

ORLOFSKY, District Judge:

Presently before the Court is the motion of Defendant, Caine, DiPasqua, Sloane & Raffaele, for summary judgment. Caine, DiPasqua essentially challenges the ability of Plaintiff, RTC Mortgage Trust 1994 N-1, to prosecute its claim for negligent misrepresentation or legal malpractice. This appears to present an issue of first impression in this district, namely whether provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") preempt the well-settled principle of New Jersey law that tort claims are not assignable prior to judgment. For the reasons set forth below, I find that federal law preempts New Jersey law on this issue. Accordingly, I will deny the motion for summary judgment.

## I. Facts and Procedural History

The circumstances giving rise to this litigation have already been summarized to some extent in *RTC Mortgage Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.*, 981 F.Supp. 334, 336–38 (D.N.J.1997) (*RTC I*). The following facts are not generally in dispute. In August, 1988, Home Federal Savings & Loan Association ("Home Federal Savings & Loan") loaned approximately $13.5 million to Atrium II Limited Partnership ("Atrium II"). *See* Plaintiff's Statement of Material Facts as to Which there is No Genuine Issue ¶ 1 (dated Dec. 23, 1997) (hereinafter Plaintiff's Statement of Facts); Defendant, Caine, DiPasqua, Sloane & Raffaele's Statement of Material Facts as to Which there is No Genuine Issue ¶ 1 (dated Nov. 12, 1997) (hereinafter Defendant's Statement of Facts). The loan was secured by an office building on a 7-acre piece of property located in Mount Laurel, New Jersey. *See* Plaintiff's Statement of Facts at ¶ 1.

For purposes of the loan from Home Federal Savings & Loan, Atrium II was represented by Caine, DiPasqua, Sloane, Raffaele, and Nigro, a Pennsylvania law firm.[1] In connection with its representation of Atrium II, Caine, DiPasqua, Sloane, Raffaele & Nigro issued a legal opinion, signed by Nigro, with respect to the Atrium II mortgage and loan. *See* Plaintiff's Statement of Facts at ¶¶ 2, 7; Defendant's Statement of Facts at ¶ 2; *see also RTC I*, 981 F.Supp. at 337. Among other things, the legal opinion stated that "the mortgage, security agreement, and financing statements are effective to create a first lien security interest in the ... property." *Id.; see also* Certification of John A. Adler ¶ 4 & Exh. C at 3 (dated Dec. 22, 1997) (hereinafter Adler Certif.); *see also id.*, Exh. B at § 10.2.

Late in 1990, Home Federal Savings & Loan began foreclosure proceedings against Atrium II in New Jersey state court. These proceedings were stayed when Atrium II filed a petition in the United States Bankruptcy Court for the District of New Jersey. Fidelity Bank, N.A. ("Fidelity Bank") filed an adversary complaint in the Bankruptcy Court claiming that it had liens on the property which were superior to those held by Home Federal Savings & Loan. In March, 1993, the District Court reversed the Bankruptcy Court's determination, rendered in May, 1992, that Fidelity Bank's liens had priority. The Third Circuit affirmed this decision in August, 1995. *See* Plaintiff's Statement of Facts at ¶ 12; Defendant's Statement of Facts at ¶ 8; *see also In re Atrium II Ltd. Partnership*, 60 F.3d 816 (3d Cir.1995) (mem.); *see also* Certification of Michael S. Miller ¶ 16 & Exh. 14 (dated Nov. 11, 1997) (hereinafter Miller Certif.) (summarizing entire history of litigation in state court and bankruptcy court).

Atrium II was not the only entity with financial problems. On July 6, 1992, during the pendency of the bankruptcy proceedings, Home Federal Savings & Loan was placed into receivership by the Resolution Trust Corporation (the "RTC"). *See* Plaintiff's Statement of Facts at ¶ 13; Defendant's Statement of Facts at ¶ 9; *see, e.g.,* Miller Certif. at ¶ 9 & Exh. 7. At that point, pursuant to 12 U.S.C. § 1821(d)(2)(F), Home Federal Savings & Loan became known as HomeFed Bank, F.A. with the RTC as its conservator. *See* Plaintiff's Statement of Facts at ¶ 13; Defendant's Statement of Facts at ¶ 9; Miller Certif. at ¶ 9 & Exh. 7. On December 3, 1993, the RTC was appointed receiver for HomeFed Bank, F.A. *See* Plaintiff's Statement of Facts at ¶ 14; Defendant's Statement of Facts at ¶ 14.

On January 31, 1994, various assets, including the Atrium II mortgage and loan, were sold by the RTC to Plaintiff, RTC Mortgage Trust 1994 N-1 ("RTC Mortgage Trust"). In connection with that sale, the RTC assigned to RTC Mortgage Trust:

> all of [RTC's] right, title, and interest in and to (1) the Assets and all interests and principal received with respect to the Assets ... (2) all insurance policies of any nature pertaining to the Assets, (3) all documents related to the Assets (including, without limitation, with respect to Assets other than Mortgage Loans, all pledge agreements, security agreements and other documents of the type listed in Section 2 which, if executed or delivered in connection with a Mortgage Loan, would be Mortgage Documents), and (4) all proceeds derived in any way from any of the foregoing, all on the terms set forth herein

*See* Certification of Allyn S. Patrick ¶ 3 & Exh. A at p. 1 (dated Dec. 10, 1997) (hereinafter Patrick Certif.).[2] This agreement be-

---

**1.** Sometime after the original Complaint was filed in this action on November 4, 1996, it was learned that Defendant, Rocco M. Nigro ("Nigro"), had left the law firm of Caine, DiPasqua, Sloane, Raffaele & Nigro. *See* Plaintiff's Statement of Facts at p. 2 n. 1. The firm, still a defendant in this action, is now known as Caine, DiPasqua, Sloane & Raffaele. I refer herein to the firm as it is currently constituted as "Caine, DiPasqua." On June 16, 1997, an Amended

Complaint reflecting, among other things, these changes was filed. *See RTC I*, 981 F.Supp. at 338.

**2.** The Assignment defined Mortgage Documents as the "documents listed in Section 2." Patrick Certif., Exh. A at § 1. Among the documents listed is "the original lender's title insurance policy, together with any negative amortization endorsement and any other endorsement thereto or, with respect to each Asset not covered by a lender's title insurance policy, an attorney's opin-

tween the RTC and RTC Mortgage Trust (the "Assignment") defined Assets as:

> The Mortgage Loans and other assets identified in the Assets Schedules that are assigned by the [RTC] to [RTC Mortgage Trust] by this Assignment including any liens and security interests securing payment of the related Note and, to the extent permitted by law, the right to assert, on a non-exclusive basis, to the same extent as the [RTC] could have asserted, the defenses commonly known as the "D'Oench Duhme" doctrine and the "federal holder in due course" doctrine and any statute of limitations that would be applicable to an action by the [RTC] based on a claim involving any of the Assets.

*Id.*, Exh. A at § 1.

RTC reserved certain rights. In particular, the Assignment provided that:

> The [RTC] and [RTC Mortgage Trust] agree that, notwithstanding anything to the contrary set forth in this Assignment (or any other transfer document delivered in connection with this Assignment), the purchase and sale of the Assets pursuant to this Agreement shall not include and the [RTC] specifically reserves for its benefit any claims and/or causes of action of any nature whatsoever that may now exist or hereafter arise, whether known or unknown, against any Person, including, without limitation, any officers, directors, employees, insiders, accountants, attorneys, other persons employed by the [RTC] or any predecessor thereof, underwriters or any other Person who has caused a loss to the [RTC] or any predecessor thereof. The foregoing is not intended as a limitation on [RTC Mortgage Trust's] rights to enforce such Assets in accordance with their terms and to realize the benefits of the Notes and the security therefor.

*Id.*, Exh. A at § 6. Finally, the Assignment provided that it would be governed by the laws of the State of New York. *Id.*, Exh. A at § 9.

The purchase by RTC Mortgage Trust of the Atrium II mortgage and loan, among other assets, was funded in part by the issuance of bonds by RTC Mortgage Trust. The mortgages and loans purchased by RTC Mortgage Trust were collateral for the bonds and Bank of America National Trust & Savings Association ("Bank of America") acted as bond trustee. *See id.* at ¶¶ 5–6; *see also id.*, Exh. C; Miller Certif., Exh. 11. Thus, simultaneously with the execution of the Assignment from the RTC to RTC Mortgage Trust, the RTC, as a matter of convenience and on behalf of RTC Mortgage Trust, assigned the relevant mortgages and loans to Bank of America. *See* Patrick Certif. at ¶¶ 5–6 & Exh. A at 1 ("Simultaneously herewith, [RTC Mortgage Trust] is entering into a certain Indenture and Series 1994–N1A Supplement thereto of even date herewith pursuant to which certain of the Assets are pledged to the Bond Trustee. To evidence such pledge, [RTC] with the consent of [RTC Mortgage Trust] intends on the date hereof to assign such Assets directly to the Bond Trustee by a separate document.").

On January 29, 1996, following the pay-off of the bonds which partially funded RTC Mortgage Trust's purchase of the mortgages and loans from the RTC, Bank of America and RTC Mortgage Trust assigned the collateral which had been pledged in connection with the issuance of the bonds. This was accomplished by Bank of America's assignment of all of its interest in the Atrium II mortgage and loan, among other things, to RTC Mortgage Trust. *See* Patrick Certif. at ¶ 6 & Exh. B–C. In particular, Bank of America assigned to RTC Mortgage Trust:

> (i) the Mortgage Loans and instruments listed in Schedule A to this Assignment, all payments made thereon, all insurance policies of any nature pertaining thereto and all accounts and documents related thereto, . . . .
>
> (vi) all proceeds derived or to be derived in any way from any of the foregoing, including, without limitation, all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or other liquid property.

*Id.*, Exh. C at 1. The Atrium II mortgage was listed in Schedule A. *Id.*, Exh. C. This

---

ion of title issued as of the date of origination of the Asset." *Id.*, Exh. A at § 2(viii).

assignment also provided that it would be governed by the laws of the State of New York. *Id.*, Exh. C at 1.

Several months later, on November 4, 1996, this litigation ensued. *See RTC I*, 981 F.Supp. at 337–38. Of particular relevance to Caine, DiPasqua's motion for summary judgment is RTC Mortgage Trust's claim in its Amended Complaint that the predecessor firm of Caine, DiPasqua, *inter alia*, was negligent in rendering the legal opinion that Home Federal Savings and Loan "possessed or was obtaining a first lien on the mortgaged premises." *See* Amended Complaint ¶¶ 38–39 (dated June 16, 1997); *see also id.* at ¶¶ 34–35 (alleging that Nigro was negligent in rendering this opinion). This would appear to be a tort claim for negligent misrepresentation or legal malpractice.

On October 20, 1997, in an Opinion & Order, I denied Caine, DiPasqua's motion to dismiss the Amended Complaint and all cross-claims which had been asserted against it. *RTC I*, 981 F.Supp. at 352. On November 24, 1997, with the consent of Defendants, Fidelity National Title Insurance Company ("Fidelity National"), Nations Title Insurance Company ("Nations Title"), and Lawyers Title Insurance Corporation ("Lawyers Title"), I entered an Order dismissing without prejudice and costs all claims that had been or could have been asserted by Fidelity National and/or Nations Title against Lawyers Title, and all claims that had been or could have been asserted by Lawyers Title against Fidelity National and/or Nations Title. *See* Consent Order at 2 (dated Nov. 24, 1997). This motion for summary judgment followed.

The Court may exercise subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). *See RTC I*, 981 F.Supp. at 338 & nn. 3–4.

## II. Standard on Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert.*

*denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir.1986).

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir.1987). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).

In deciding whether triable issues of fact exist, Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255–56, 106 S.Ct. 2505.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an

entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," *id.,* "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 ("by its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit"); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the " 'mere scintilla' threshold"), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## III. Discussion

In support of its motion for summary judgment, Caine, DiPasqua makes several arguments challenging RTC Mortgage Trust's ability to maintain this action. Caine DiPasqua argues that RTC Mortgage Trust was never assigned the right to bring the negligence, or legal malpractice, claim against Caine, DiPasqua because the RTC reserved to itself the right to prosecute such claims. Caine, DiPasqua also argues that RTC Mortgage Trust does not own the claim against Caine, DiPasqua. For the reasons set forth below, I conclude that these contentions are without merit. Caine, DiPasqua next contends that RTC could not have assigned its right to bring a tort claim against Caine, DiPasqua. In light of established New Jersey law that tort claims are not generally assignable before being reduced to judgment, this argument presents what appears to be a serious impediment to RTC Mortgage Trust's claim against Caine, DiPasqua. Under these circumstances, however, I conclude that New Jersey law governing the validity of assignments of tort claims prior to judgment is preempted by federal law, more specifically, by certain provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 ("FIRREA").

### A. Acquisition by RTC Mortgage Trust of the Claim Against Caine DiPasqua

#### 1. The Assignment by RTC to RTC Mortgage Trust

The first argument which I must address is raised by Caine, DiPasqua for the first time in its reply brief.[3] Caine, DiPasqua argues that the assignment of the RTC's interest in the Atrium II mortgage and loan to RTC Mortgage Trust provided for the reservation of certain rights by the RTC, and that among the rights reserved was the right to sue Caine, DiPasqua for negligent misrepresentation or legal malpractice. Thus, Caine, DiPasqua concludes, only the RTC can sue Caine, DiPasqua, and RTC Mortgage Trust may not. *See* Caine, DiPasqua's Reply Memorandum at 5 (citing *FDIC v. Martin,* 770 F.Supp. 623 (M.D.Fla.1991)); *see also* 12 U.S.C. § 1821(d)(2)(B) (providing RTC with power, as receiver or conservator, to operate the failed savings and loan institution including, power to "collect all obligations and money due the institution"); 12 U.S.C. § 1441a(b)(14) (governing statute of limita-

---

**3.** Caine, DiPasqua's explains this by noting that the document upon which the argument is based was never produced during discovery. *See* Caine, DiPasqua's Reply Memorandum of Law 3 n. 2 (dated Jan. 15, 1998) (hereinafter Caine, DiPasqua's Reply Memorandum).

tions in tort cases involving RTC); 12 U.S.C. § 1821(d)(14) (same).

■ This argument is based on an entirely faulty reading of section 6 of the Assignment from the RTC to RTC Mortgage Trust. That section provides in relevant part:

> The [RTC] and [RTC Mortgage Trust] agree that, notwithstanding anything to the contrary set forth in this Assignment (or any other transfer document delivered in connection with this Assignment), the purchase and sale of the Assets pursuant to this Agreement shall not include and the [RTC] specifically reserves for its benefit any claims and/or causes of action of any nature whatsoever that may now exist or hereafter arise, whether known or unknown, *against any Person*, including, without limitation, any officers, directors, employees, insiders, accountants, attorneys, other persons employed by the [RTC] or any predecessor thereof, underwriters or any other Person *who has caused a loss to the [RTC] or any predecessor thereof.*

Patrick Certif., Exh. A at § 6 (emphasis added). This language can only reasonably be read to mean that RTC reserved its rights to sue anyone "who has caused a loss to the [RTC] or any predecessor thereof." To adopt the reading suggested by Caine, DiPasqua would mean that the language "who has caused a loss to the [RTC] or any predecessor thereof" would modify only "any other Person." It would follow then that the RTC reserved the right to sue, for example, any attorney, regardless of whether he or she caused a loss to the RTC, as well as any other person, but only if such other person caused a loss to the RTC. This parsing of the language of section 6 would create only ambiguity and self-contradiction, and is not reasonable. Thus, unless Caine, DiPasqua falls into the category of persons "who . . . caused

a loss to the RTC or any predecessor thereof," and Caine, DiPasqua does not argue that it may be so characterized, then RTC did not in section 6 of the Assignment retain its right to sue Caine, DiPasqua for their allegedly negligent opinion letter.

If there was any doubt about whether RTC retained the right to sue with respect to the Atrium II mortgage and loan, section 6 of the Assignment makes abundantly clear that that section was not intended to prevent RTC Mortgage Trust from enforcing the mortgage and loan and realizing the benefits of the related notes. Section 6 provides in relevant part:

> The foregoing is not intended as a limitation on [RTC Mortgage Trust's] rights to enforce such Assets in accordance with their terms and to realize the benefits of the Notes and the security therefor.

*Id.*, Exh. A at § 6. Suing Caine, DiPasqua for a negligent misrepresentation made in connection with and which allegedly damaged RTC Mortgage Trust with respect to the Atrium II mortgage and loan is reasonably classified as "enforc[ing]" the mortgage loans. *Id.*; *see also id.*, Exh. A at p. 1 (assigning to RTC Mortgage Trust "all proceeds derived in any way from" property already assigned); *see, e.g., FDIC v. Abraham*, 439 F.Supp. 1150, 1152 (E.D.La.1977) (holding that "since the FDIC had the right to purchase an asset which amounted to a chose in action, it likewise has the right to sue upon it and reduce it to judgment").[4]

### 2. Ownership of the Claim Against Caine, DiPasqua

■ Caine, DiPasqua also argues that RTC Mortgage Trust does not own the claim against Caine, DiPasqua because, when RTC Mortgage Trust purchased certain assets from the RTC, RTC Mortgage Trust pur-

---

4. On February 4, 1998, the Federal Deposit Insurance Corporation (the "FDIC") as successor to the RTC as receiver/conservator of HomeFed Bank, executed a "Clarification of Assignment of Mortgage." The purpose of this document was "to confirm and clarify" that claims held by the FDIC against the law firm of Caine, DiPasqua, Fidelity National, and Lawyers Title "were part of the obligations transferred to" RTC Mortgage Trust on January 31, 1994. *See* Letter from John A. Adler (dated Feb. 10, 1998). *But see* Letter from Michael S. Miller (dated Feb. 17, 1998). Because I find that Caine, DiPasqua's argument as to the meaning of section 6 of the Assignment is wholly without merit and that RTC Mortgage Trust did own the claim against Caine, DiPasqua well before execution of this document, I need not determine what effect, if any, this document has.

chased only a note and a mortgage, but not a claim for negligent misrepresentation. *See* Caine, DiPasqua'a Reply Memorandum at 6–10. This argument is entirely without merit.

First, it is clear that if the RTC had the right to sue Caine, DiPasqua with respect to its legal opinion rendered in connection with a mortgage and loan as to whether RTC's lien over Atrium II had priority over all other liens—and Caine, DiPasqua does not dispute that the RTC did have such a right, *see* Caine, DiPasqua's Reply Memorandum at 5—the RTC transferred that right to RTC Mortgage Trust. The language of the assignment from the RTC to RTC Mortgage Trust is extremely broad. What RTC "assign[ed], transfer[red], and convey[ed]" is:

all of [RTC's] *right, title, and interest in and to (1) the Assets and all interests and principal received with respect to the Assets* ... (2) all insurance policies of any nature pertaining to the Assets, (3) *all documents related to the Assets* (including, without limitation, with respect to Assets other than Mortgage Loans, all pledge agreements, security agreements and other documents of the type listed in Section 2 which, if executed or delivered in connection with a Mortgage Loan, would be Mortgage Documents), and (4) *all proceeds derived in any way from any of the foregoing,* all on the terms set forth herein

Patrick Certif., Exh. A at p. 1 (emphasis added). Given the breadth of this language and the narrow swath of rights retained by the RTC in the Assignment, *see id.,* Exh. A at § 6, the notion that "all [RTC Mortgage Trust] purchased was a loan evidenced by a promissory note secured by a mortgage" is without merit. The language of the Assignment reflects an unambiguous intent on the RTC's behalf to transfer everything that it owned with respect to the Atrium II mortgage and loan, excepting those rights retained in section 6 of the Assignment.

■ No "magic words" are necessary to assign tort claims under New York law.[5]

*See, e.g., Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 152–53 (2d Cir.1995) (holding under New York law that transfer of interest in "transaction" was broader than interest in contract and included transfer of tort claims, and distinguishing language of assignment from language considered in *Fox v. Hirschfeld,* 157 A.D. 364, 142 N.Y.S. 261 (N.Y.A.D. 1st Dept.1913); *Tawil v. Finkelstein, Bruckman, Wohl, Most & Rothman,* 223 A.D.2d 52, 646 N.Y.S.2d 691, 692 (N.Y.A.D. 1st Dept. 1996)) (holding that "no special form or language is necessary to effect an assignment as long as the language shows the intention of the owner of a right to transfer it"). The right to sue Caine, DiPasqua for a negligent misrepresentation or for legal malpractice committed in connection with the Atrium II mortgage and loan is unequivocally embraced by the language of the Assignment.

Additionally, when Bank of America reassigned the Atrium II mortgage and loan to RTC Mortgage Trust, it did so in language as broad, if not broader, than the language of assignment from RTC to RTC Mortgage Trust. *See* Patrick Certif., Exh. C at 1. Thus, if ever Bank of America was assigned the claim against Caine, DiPasqua, a fact not disputed, it reassigned that claim to RTC Mortgage Trust.

Accordingly, having found that section 6 has no effect on RTC Mortgage Trust's right to sue Caine, DiPasqua for negligent misrepresentation or legal malpractice, *see* Part III. A.1, *supra,* I conclude that RTC does own the claim against Caine, DiPasqua. I must now consider whether the transfer prior to judgment of a tort claim was valid.

**B. Non–Assignability of Tort Claims under New Jersey Law**

■ Caine, DiPasqua forcefully argues that tort claims, such as RTC Mortgage Trust's claims against it, cannot be assigned prior to judgment under the law of New Jersey. Indeed, this is the law of New Jersey. *See, e.g., Integrated Solutions, Inc. v.*

---

**5.** The Assignment from the RTC to RTC Mortgage Trust was governed by New York law. While the validity of an assignment of a tort claim may be governed by the law of New Jersey, *see, e.g., Conopco, Inc. v. McCreadie,* 826 F.Supp.

855, 864–65 (D.N.J.1993), *aff'd mem.,* 40 F.3d 1239 (3d Cir.1994), as I discuss below, *see* Part III.B & n. 6, *infra,* interpretation of the Assignment as a contract is governed by New York law. *See id.* at 864; Partick Certif., Exh. A at § 9.

*Service Support Specialties, Inc.*, 124 F.3d 487, 490 (3d Cir.1997) (noting consistency of New Jersey court holdings that tort claims cannot be assigned before judgment); *Alcman Servs. Corp. v. Bullock*, 925 F.Supp. 252, 257–59 (D.N.J.1996) (discussing assignment of legal malpractice claims prior to judgment under law of New Jersey and Pennsylvania, and noting limited authority of *Hedlund Mfg. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 539 A.2d 357 (1988)), *aff'd*, 124 F.3d 185 (3d Cir.1997); *Conopco*, 826 F.Supp. at 865–67. If New Jersey law were to apply, *See* Plaintiff's Memorandum of law in Opposition to Summary Judgment 13 n. 7 (dated Dec. 23, 1997) (hereinafter Plaintiff's Memorandum), then, RTC Mortgage Trust quaintly argues, the New Jersey rule against such assignments should not apply to it because, among other reasons, such an application would lead to harmful results and because application of this "ancient" rule is not warranted as a matter of policy. *See* Plaintiff's Memorandum at 13–23. Assuming, *arguendo*, that New Jersey law governs the question of the assignment of the tort claim against Caine, DiPasqua,[6] RTC Mortgage Trust's arguments—which are really just pleas for leniency—have no force. Thus, if federal law does not preempt New Jersey law regarding the validity of the assignment of tort claims prior to judgment, Caine, DiPasqua would be entitled to summary judgment. It is to this question which I now turn.

## C. Preemption of State Law by FIRREA

Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, state law that "interfere[s] with or [is] contrary to" federal law is invalid. *See RTC v. Cityfed Fin. Corp.*, 57 F.3d 1231, 1242–43 (3d Cir.1995) (Becker, J.) (citing *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991)), *overruled on other grounds sub nom. Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997). Accordingly, Congress may preempt state law in several ways: "1) through evidence of congressional intent to supplant state authority in a particular area, as expressed either through the language of the statute, or implicitly through the enactment of a federal regulatory scheme 'so pervasive the Congress left no room for the States to supplement it; or 2) when federal law and state law actually conflict, such as when compliance with both federal and state regulations is a physical impossibility,' " or when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* at 1243 (citations omitted); *see also In the Matter of Reading Co.*, 115 F.3d 1111, 1117 (3d Cir.1997) ("Congress may manifest its intent when it expressly preempts state regulation, when it implicitly preempts state regulation by so occupying the field with comprehensive federal regulation that it leaves no room for state law, or, again implicitly, when there is an actual conflict between state and federal law"); *see also Health Maintenance Org. of New Jersey v. Whitman*, 72 F.3d 1123, 1127 (3d Cir.1995). Of course, to determine Congress' intent, I begin with the text of FIRREA and then move on to its "structure and purpose." *Id.* at 1127; *see also id.* at 1127–28.

---

**6.** New Jersey law would govern the validity of assignment of a tort claim prior to judgment if New Jersey law governs the underlying substantive negligent misrepresentation and legal malpractice claim being assigned. *See Conopco*, 826 F.Supp. at 865. Applying New Jersey's choice of law principles, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (holding that federal court sitting in diversity must apply the choice-of-law rules of forum state); *see also Capone v. Nadig*, 963 F.Supp. 409, 412 (D.N.J.1997); *Boyson v. Archer & Greiner, P.C.*, 308 N.J.Super. 287, 296–97, 705 A.2d 1252 (App.Div.1998) (discussing choice of law principles in context of legal malpractice action), it is clear that New Jersey law would govern the underlying substantive claim of negligent misrepresentation or legal malpractice against Caine, DiPasqua. Caine, DiPasqua held itself out as "members of the bar of New Jersey" and rendered a legal opinion as to how the law of New Jersey applied to a piece of property located in New Jersey on behalf of a client whose principal office was in New Jersey. *See* Adler Certif., Exh. A at 1, Exh. B at 26, Exh. C at 1–2, 5; Miller Certif., Exh. 14; *RTC I*, 981 F.Supp. at 348–49. Not to mention the meaningful relationships of the parties and the transaction to New Jersey, which far outweigh the interests of any other state in seeing its laws applied to the claim against Caine, DiPasqua, there is the very substantial interest New Jersey has in regulating the conduct of lawyers who practice law in New Jersey without proper authorization.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 ("FIRREA"), was a vital part of the federal government's response to the savings and loan crisis which occurred in the United States in the late 1980's. *See, e.g., Sunshine Development, Inc. v. FDIC,* 33 F.3d 106, 111 (1st Cir.1994). Among the major goals of FIRREA were the "establish[ment of] organizations and procedures to obtain and administer the necessary funding to resolve failed thrift cases and to *dispose of the assets of these institutions.*" H.R.Rep. No. 101–54(I), at 307–08, *reprinted in* 1989 U.S.C.C.A.N. 87, 103–04 (emphasis added)

■ Several provisions of federal banking law effectuate Congress' intent to allow the FDIC and the RTC[7] to exercise sweeping powers in disposing of the assets of failed savings and loan institutions.[8] For example, and perhaps most germane to the RTC's power to transfer its tort claim against Caine, DiPasqua to RTC Mortgage Trust, the RTC has the power, either as conservator or receiver, to:

> transfer any asset or liability of the institution in default … without any approval, assignment, or consent with respect to such transfer.

12 U.S.C. § 1821(d)(2)(G)(i). Additionally, the RTC has the power, as receiver, to "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution." 12 U.S.C. § 1821(d)(2)(E). The RTC may also, "with respect to any insured bank, organize a new national bank … or a bridge bank." 12 U.S.C. § 1821(d)(2)(F); *see also* 12 U.S.C. § 1821(m-n). In addition, the RTC may:

> acquire, hold, lease, mortgage, maintain, or *dispose of, at public or private sale, real and personal property, using any legally available private sector methods* including without limitation, securitization of debt or equity, limited partnerships, mortgage investment conduits, and real estate investment trusts, *and otherwise exercise all the usual incidents of ownership of property necessary and convenient to the operations of the Corporation.*

12 U.S.C. § 1441a(b)(9)(D); *see Interurban Inv. Corp. v. RTC,* 1996 WL 139766, *2 (E.D.La. Mar.27, 1996) (noting that RTC in capacities as both corporation and receiver or conservator may own and administer assets under 12 U.S.C. § 1441a(b)(9)). Finally, the RTC, as conservator or receiver, may:

> (i) exercise all powers and authorities specifically granted to conservators or receivers, respectively, under this chapter and *such incidental powers as shall be necessary to carry out such powers;* and
>
> (ii) take any action authorized by this chapter, which the Corporation determines is in the best interests of the depository institution, its depositors, or the Corporation.

12 U.S.C. § 1821(d)(2)(J) (emphasis added); *see also* 12 U.S.C. § 1441a(b)(9)(M). Numerous courts have noted the breadth and all-inclusiveness of these powers which, Congress explained, were "designed to give the FDIC power to take all action necessary to resolve the problems posed by a financial institution in default," H.R.Rep. 101–54(I), at 330, *reprinted in* 1989 U.S.C.C.A.N. at 126. *See, e.g., Sahni v. American Diversified Partners,* 83 F.3d 1054, 1058 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 765, 136 L.Ed.2d 712 (1997). Indeed, these powers have been described as "unprecedented," *Sunshine Development, Inc.,* 33 F.3d at 111, and FIRREA as "the most sweeping thrift reform law in the nation's history." *Praxis Properties, Inc. v. Colonial Sav. Bank,*

---

**7.** For the purposes of FIRREA, the FDIC and the RTC are granted similar, if not identical powers. *See, e.g.,* 12 U.S.C. § 1441a(b)(4)(A) (providing that RTC "in addition to any other provision of [section 1441a] … shall have the same powers and rights to carry out its duties … as the [FDIC] has under [12 U.S.C. §§ 1821–23]"); *Sunshine Development, Inc.,* 33 F.3d at 112 n. 6; *RTC v. Maplewood Inv.,* 31 F.3d 1276, 1290 (4th Cir.1994) (noting that "those courts of appeals which have considered the issue appear uniform-

ly to have decided that 'the RTC possesses the same rights and powers as are available to the FDIC'"); *see also Adams v. RTC,* 1993 WL 181303, *6 (D.Minn. May 19, 1993) (discussing relationship between FDIC and RTC), *aff'd,* 10 F.3d 568 (8th Cir.1993).

**8.** Indeed, the FDIC had some of these powers prior to the passage of FIRREA.

*S.L.A.*, 947 F.2d 49, 62 (3d Cir.1991) (Becker, J.).

 New Jersey's rule against the assignability of tort claims prior to judgment stands as a substantial obstacle to the accomplishment and execution of the full purposes and objectives of Congress. In particular, New Jersey's rule would meaningfully frustrate, among other powers, the RTC's broad powers to transfer assets, dispose of real or personal property, liquidate failed depository institutions and realize upon the assets of those institutions, organize new or bridge banks, and otherwise exercise the usual incidents of ownership of property necessary to the RTC's mission under FIRREA. If the New Jersey rule against the assignability of tort claims prior to judgment were to survive in the face of this broad grant of power to the RTC, then the RTC would be forced to bring all tort claims under New Jersey law and could not then dispose of any other assets out of with which the tort claims arise. Moreover, survival of the New Jersey rule in the face of FIRREA would prevent the RTC from efficiently transferring large numbers of mortgages and loans at a time because it would have to determine the assignability of certain mortgages and loans on a case by case basis to determine whether there may be a tort claim arising out of the transaction. *See Martin,* 770 F.Supp. at 627; *FDIC v. Main Hurdman,* 655 F.Supp. 259, 267–68 (E.D.Cal.1987) (noting that authority to transfer "every asset" includes authority to transfer choses in action not transferable under state law, and that state law strictures on assignment of assets which compel assignment on a asset-by-asset basis would impede rescue of failing banks). Such an obstacle would prevent the RTC from achieving one of the goals of FIRREA, "expeditious[ ] [winding-up] of the affairs of literally hundreds of failed institutions throughout the country." *Freeman v. FDIC,* 56 F.3d 1394, 1398 (D.C.Cir.1995) (citation omitted). In light of these overriding federal interests clearly articulated in federal statutes, New Jersey law governing the validity of the assignment of tort claim prior to judgment may not stand.[9]

State laws relating to the transferability or assignability of various forms of property, including tort claims, have faced the same fate as New Jersey's rule on the assignability of tort claims prior to judgment. *See, e.g., Sahni,* 83 F.3d at 1059 (holding that California rule regarding consent necessary for transfer of asset was preempted by 12 U.S.C. § 1821(d)(2)(G)(i)(II), and citing cases); *FDIC v. Bank of Boulder,* 911 F.2d 1466, 1473–74 (10th Cir.1990) (holding that asset which was not transferable under state law was transferable under federal law, and drawing analogy from cases finding tort claims freely assignable), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991); *NCNB Texas Nat'l Bank v. Cowden,* 895 F.2d 1488, 1498–1500 (5th Cir.1990) (finding that federal law preempted state law as to transferability of fiduciary appointment); *In re Marin Town Ctr.,* 142 B.R. 374, 382 n. 5 (N.D.Cal.1992) (holding that, even if stipulation was not assignable under state law, state law was preempted by section 1821(d)(2)(G)(i)); *Stoltz v. Wilmington Trust Co.,* 1992 WL 127516 (Del.Ch. June 9, 1992) (holding that power to transfer asset under section 1821(d)(2)(G) implies power to transfer asset which would not be transferable under state law), *appeal refused by,* 610 A.2d 727, 1992 WL 151331 (Del.Supr. June 12, 1992).

The several arguments raised by Caine, DiPasqua either in opposition to a finding of

---

9. Because the New Jersey rule regarding assignability of tort claims prior to judgment would so frustrate the exercise of powers given to the RTC, including the power to dispose of property, and is therefore preempted by FIRREA, I need not determine whether a tort claim is transferable as an "asset" within the meaning of 12 U.S.C. § 1821(d)(2)(G)(i). *See, e.g., Cowden,* 895 F.2d at 1498–99 (noting definition of asset promulgated by Financial Accounting Standards Board, and concurring in district court's broader interpretation of term "asset" as used in section 1821); Cylde P. Stickney & Roman L. Weil, *Financial Accounting* 49–50, G–8 (7th ed.1994) (defining asset as "resources ... for which [a] firm has acquired rights to their use in the future as a result of a past transaction or exchange and ... for which the firm can measure or quantify the future benefits with a reasonable degree of precision"). Plus, regardless of whether a tort claim is an asset under section 1821, it surely is "property" within the meaning of 12 U.S.C. § 1441a(b)(9)(D).

preemption and in favor of a state rule of unassignability are off the mark. In opposition to a finding of preemption, Caine, DiPasqua relies substantially on *Waterview Mgmt. Co. v. FDIC,* 105 F.3d 696 (D.C.Cir.1997). That case reversed a district court's finding that a contract was preempted by 12 U.S.C. § 1821(d)(2)(G)(i)(II). In *Waterview,* a defaulting bank customer, PortAmerica Associates, agreed with a bank, ironically enough, HomeFed Bank, that the bank could foreclose upon a certain piece of land, but that the bank would have to allow a third-party, Waterview Management Company, the option of, among other things, purchasing and marketing the land. *Id.* at 697–98. After the RTC took over HomeFed, as its receiver and conservator, RTC sold the land without honoring HomeFed's commitment to Waterview. The D.C. Circuit held that 12 U.S.C. § 1821(d)(2)(G)(i)(II) did not allow the RTC to repudiate HomeFed's contract with Waterview. The asset which the RTC was allowed to transfer could not be transferred under section 1821 without reference to state contract law because state contract law, most importantly, the option to Waterview, defined the asset. *Id.* at 699–700. The D.C. Circuit was clearly motivated by a desire to avoid an unconstitutional result in holding that the Takings Clause, U.S. Const. amend. V, prevents federal actors from "preempting" property interests. *See, e.g., id.* at 701–02.

The holding of *Waterview,* motivated largely by Takings Clause concerns, does not, however, erect any obstacle to holding that New Jersey's rule prohibiting prejudgment assignment of tort claims is preempted by FIRREA. Completely apart from the fact that those aspects of a tort claim which allow it to be transferred may not necessarily be thought of by themselves as property interests such that preemption of New Jersey's unassignability rule effects a taking on the person who owns a tort claim, *see id.* (citing *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)), preemption of the New Jersey rule by FIRREA does not effect any taking, let alone a taking from Caine, DiPasqua. Far from depriving the holder of a tort claim of something of value by making the assignment of a tort claim valid, thereby implicat-

ing the Takings Clause, preemption in this case provides the holder of a tort claim with the additional *benefit* of liquidity.

If Caine, DiPasqua's intends to rely on *Waterview* for the more general proposition that preemption is impermissible any time preemption would alter economic reality, for example, by altering the worth of a tort claim, such reliance would be misguided. First, such reliance wholly "ignore[s] very substantial differences in what laws govern the substantial rights of parties" following the imposition of a receivership or conversatorship on a failed bank. *FDIC v. Shain, Schaffer & Rafanello,* 944 F.2d 129, 135 (3d Cir.1991). Second, such a principle would almost certainly foreclose the possibility of preemption under any circumstances.

In support of its argument that New Jersey law must control the issue of whether RTC could have assigned to RTC Mortgage Trust any tort claims it may have had, Caine, DiPasqua cites numerous cases which relate to an assignee's ability to sue in federal court or the statute of limitations applicable to a particular assignee. *See* Caine, DiPasqua's Memorandum of Law in Support of Summary Judgment Motion 12–18 (dated Nov. 12, 1997). From these cases, Caine, DiPasqua divines the principle that certain rights—including the right to sue for negligent misrepresentation or legal malpractice—are personal to RTC and could not have been assigned under federal law.

Caine, DiPasqua's creation of a federal common law of "unassignability of tort claims" is fundamentally mistaken. Federal subject matter jurisdiction is not something which is traditionally understood as property capable of ownership. In this sense, federal subject matter jurisdiction is unlike a tort claim, something which is much more traditionally understood as property subject to ownership and, indeed, assignment. *See, e.g.,* N.Y. Gen. Constr. L. § 39 ("the term personal property includes chattels, money, things in action, and all written instruments themselves ... by which any right, interest, lien or incumbrances in, to or upon property, or any debt or financial obligation is created acknowledged, evidences, transferred, dis-

charged or defeated ... and everything, except real property, which may be the subject of ownership"). Thus, the cases cited by Caine, DiPasqua, *see, e.g., RTC Commercial Assets Trust 1995–NP3–1 v. Phoenix Bond & Indemnity Co.,* 943 F.Supp. 962 (N.D.Ill. 1996), provide little, if any, guidance as to whether a tort claim may be assigned under federal law.

The other line of cases discussed by Caine, DiPasqua relates to whether the statute of limitations set forth in 12 U.S.C. § 1821(d)(14) is subject to assignment. *See, e.g., Federal Fin. Co. v. Hall,* 108 F.3d 46 (4th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 157, 139 L.Ed.2d 102 (1997). Once again, because a statute of limitations is unlike a property interest, such as a tort claim, any analogy which Caine, DiPasqua attempts to draw in order to foreclose the assignment of the RTC's tort claim to RTC Mortgage Trust is inapt. Accordingly, I find that New Jersey's rule prohibiting the assignment of tort claims prior to judgment is preempted by FIRREA.

### IV. Conclusion

For the reasons set forth above, Caine, DiPasqua's motion for summary judgment on all claims and cross-claims asserted against it will be denied.